UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | |
|---|---|
| GINA YOUNG,<br><br>    **Plaintiff,**<br><br>V.<br><br>HARTFORD LIFE & ACCIDENT INSURANCE COMPANY and GROUP LONG TERM DISABILITY PLAN FOR EMPLOYEES OF FLOWERS FOODS, INC. GROUP INSURANCE PLAN,<br><br>    **Defendants.** | CIVIL ACTION NO. 6:19-61-KKC<br><br><br>**OPINION AND ORDER** |

\* \* \* \* \* \* \* \*

This matter is before the Court on the motion for judgment on the pleadings (Docket Entry "DE" 25) filed by plaintiff Gina Young. For the following reasons, the motion will be denied.

**I.  Background**

Young asserts a claim for disability benefits under a long-term disability plan provided by defendant Hartford Life & Accident Insurance Company for the employees of Flowers Foods, Inc.

Young began working for Flowers on June 3, 2009 as a General Worker in the Manufacturing Department. (DE 1, Complaint, ¶ 7; Administrative Record ("AR") at 1110.) She became insured under the Hartford disability plan on September 3, 2009. (AR at 1110.) Young ceased working for Flowers on July 12, 2012 because "pain and stiffness in [her] neck became worse." (AR at 1113.)

On November 12, 2012, she applied for long-term disability benefits under the Hartford plan. (AR at 1110-18; DE 1, Complaint, ¶ 9.) She asserted disability due to cervical spondylosis,

which is a term for age-related wear and tear affecting the spinal disks in the neck. (AR at 375; DE 1, Complaint, ¶ 7.)

Under the plan, for the first two years, the definition of "disability" or "disabled" meant that the claimant was "prevented from performing one or more of the Essential Duties of *Your Occupation*." (AR at 20) (emphasis added). After the first two years, however, the claimant has to prove that she is "prevented from performing one or more of the Essential Duties of *Any Occupation*." (AR at 20) (emphasis added); (DE 25-1, Mem. at 8 n.3.)

The phrase "Any Occupation" is defined as:

> an occupation for which you are qualified by education, training or experience, and that has an earnings potential greater than an amount equal to the lesser of the product of your Indexed Pre-disability Earnings and the Maximum Monthly Benefit shown in the Schedule of Insurance.

(AR at 19.)

By letter dated February 8, 2013 (AR at 369), Hartford informed Young that it had approved her claim. (AR at 373.) At that time, the applicable definition of disability was an inability to perform "one or more of the Essential Duties of *Your Occupation.*" (DE 25-1, Mem. at 8 n.3.) The plan provided that her benefits would terminate on the first to occur of various events including the date she "was no longer Disabled as defined" and the date she failed to furnish "Proof of Loss" when Hartford requested it. (AR at 9.) "Proof of Loss" includes documentation of the date the alleged disability began and the cause of the disability, medical records, and the names of treating physicians. (AR at 16.) The plan provided that Hartford could request Proof of Loss throughout a claimant's disability. (AR at 16.)

Beginning in 2015, however, the more stringent definition of disability applied to Young's claim. Instead of simply proving that she was unable to perform the essential duties of her own

2

occupation, she was required to prove she was unable to perform the essential duties of "any occupation." (DE 25-1, Mem. at 8 n.3; AR at 271.) By letter dated November 9, 2017, Hartford informed Young that it had reopened her claim for disability benefits. (AR at 216.) It asked that she complete and return an Attending Physician's Statement and a Claimant Questionnaire within 21 days.

By letter dated April 17, 2018, Hartford informed Young that she had not established that she met the "any occupation" definition of disability under the plan. (AR at 198.) Accordingly, it would not pay her any benefits beyond April 16, 2018. Hartford explained that, based on the medical evidence in the record, it had determined that Young was qualified to perform various occupations with median wages from about $2,500 to $3,000 per month.

Young appealed that decision. (AR at 590.) By letter dated December 14, 2018, Hartford affirmed the denial of benefits. Hartford stated that its decision was based on a "full and fair review" of "all documents" contained in Young's claim file and certain new information including an Independent Medical Evaluation ("IME") conducted by Dr. James Owen, which Young submitted, and a medical records review conducted by Dr. Ira Weisberg. Dr. Weisberg determined that Young could work full-time, i.e., 8 hours per day for 40 hours per week, with the following restrictions in place:

- Reaching above shoulder level [limited to] 30 minutes at a time, up to 2.5 hours total out of an 8 hour day.
- Lift[ing], carry[ing], push[ing], and pull[ing] up to 20 lbs., occasionally, 10 lbs. frequently, and 5 lbs. constantly.

(AR at 571.)

He determined that Young needed no restrictions regarding sitting, standing or walking. (AR at 570).

Hartford commissioned an employability analysis based upon the restrictions set forth by Dr. Weisberg. The analysis identified multiple occupations that Young could perform with a monthly median wage ranging from $1787.07 to $3064.53 per month. (AR at 511.) Accordingly, Hartford affirmed the decision to terminate Young's benefits. (AR at 189.)

Young then filed this action, which asks the Court to reverse the plan administrator's decision under 29 U.S.C. § 1132(a)(1)(B).

**II. Analysis**

The plan grants Hartford "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy." (AR at 19.) Thus, the parties have stipulated that the Court should review Hartford's denial of benefits under the "arbitrary and capricious" standard. (DE 21.) *See McClain v. Eaton Corp. Disability Plan*, 740 F.3d 1059, 1063–64 (6th Cir. 2014) (holding that, when a benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan, then a denial of benefits is reviewed only to determine if it was arbitrary and capricious).

The arbitrary and capricious standard is "the least demanding form of judicial review of administrative action.*" Farhner v. United Transp. Union Discipline Income Prot. Program*, 645 F.3d 338, 342 (6th Cir. 2011) (citation omitted). "A plan administrator's decision will not be deemed arbitrary or capricious so long as it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome." *Judge v. Metropolitan Life Ins. Co*., 710 F.3d 651, 657 (6th Cir. 2013) (citation and internal quotations omitted). "When conducting a review of an ERISA benefits denial under an arbitrary and capricious standard, we are required to consider

only the facts known to the plan administrator at the time he made his decision." *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 381 (6th Cir. 1996).

The arbitrary and capricious standard extends to this Court's review of the plan administrator's interpretations of the plan itself, *Kovach v. Zurich American Ins. Co.*, 587 F.3d 323, 328 (6th Cir. 2009), as well as the plan administrator's factual determinations, *see Gatlin v. Nat'l Healthcare Corp.*, 16 F. App'x 283, 288 (6th Cir. 2001). Under this standard of review, a court must uphold the plan administrator's decision "if it is the result of a deliberate, principled reasoning process and is supported by substantial evidence." *Glenn v. MetLife*, 461 F.3d 660, 666 (6th Cir. 2006) (citation omitted). "Put another way, 'when it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary and capricious.'" *Pflaum v. UNUM Provident Corp.*, 175 F. App'x 7, 9 (6th Cir. 2006) (quoting *Williams v. Int'l Paper Co.*, 227 F.3d 706, 712 (6th Cir. 2000)).

Nevertheless, the arbitrary-and-capricious standard does not require courts "merely to rubber stamp the administrator's decision." *Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir.2004) (citation omitted). The Court must review "the quality and quantity of the medical evidence and the opinions on both sides of the issues." *McDonald v. W.-S. Life Ins. Co.*, 347 F.3d 161, 173 (6th Cir. 2003). Even under the deferential standard of review, the court cannot "uphold a termination when there is an absence of reasoning in the record to support it." *Id.*

Also relevant to the standard of review, Young points out that Hartford had an inherent conflict of interest because it both evaluates and pays the benefits for claims under the ERISA plan. *See Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 112 (2008). There does not appear to be any dispute that Hartford performed both roles here. The Court will consider Hartford's

inherent conflict of interest in reviewing the reasonableness of the decision. *Hogan v. Life Ins. Co. of N. Am.*, 521 F. App'x 410, 417 (6th Cir. 2013).

Young argues that Hartford's December 14, 2018 decision on appeal denying her disability benefits is arbitrary and capricious for three reasons.

First, Young argues in her motion that there is no evidence in the record indicating that her condition improved between the 2013 determination that she met the plan's definition of disabled and the 2018 determination that she did not. (DE 25-1, Mem. at 19.) As discussed, however, the applicable definition of "disability" changed in that time period. While in 2013, Young was required to prove she was unable to perform only her "own occupation," in 2018, she was required to prove that she was unable to perform "any occupation." (DE 25-1, Mem. at 8 n.3.)

Further, as Young recognizes in her reply brief (DE 27, Reply at 5), to succeed on her claim for disability benefits under ERISA, Young had the burden of proving by a preponderance of the evidence that she is "disabled" as that term is defined under the plan. *Javery v. Lucent Techs., Inc. Long Term Disability Plan for Mgmt. or LBA Employees,* 741 F.3d 686, 701 (6th Cir. 2014). This is true even if disability benefits have been previously awarded but terminated. *Miller v. Metro. Life Ins. Co.*, 925 F.2d 979, 985 (6th Cir. 1991) (Plaintiff implies that once disability benefits are conferred, the burden of proof lies with the insurance company to prove that the employee can return to her former regular employment. However, under the terms of the Plan, it is the employee who must continue to supply on demand proof of continuing disability to the satisfaction of the insurance company.")

The plan requires that Young submit proof of continuing disability upon demand. (AR at 16.) Thus, "the language of the Policy. . . imposes a burden on the claimant to prove continued

disability, not on the insurer to prove that a claimant is not disabled." *Nicolai v. Aetna Life Ins. Co.*, No. 08-CV-14626, 2010 WL 2231892, at *6 (E.D. Mich. June 3, 2010). "The insured employee bears the burden of proving his or her continuing 'disability'." *Kiel v. Life Ins. Co. of N. Am.*, 345 F. App'x 52, 58 (6th Cir. 2009) (quoting *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 289 (6th Cir.2005)).

"All that ERISA requires is that substantial evidence support a plan fiduciary's benefits decision—whether it be to deny benefits initially or to terminate benefits previously granted—when, as here, the plan fiduciary is vested with the discretion to determine, inter alia, both initial and continued eligibility for benefits." *Ellis v. Liberty Life Assur. Co. of Bos.*, 394 F.3d 262, 274 (5th Cir. 2004) (rejecting the argument that "once the fiduciary approves entitlement to [long-term disability] benefits, subsequent termination of those benefits would have to be supported by substantial evidence of *a change in the employee's condition*.")

"[T]he plan fiduciary is not required to obtain proof that a substantial change in the [disability] recipient's medical condition occurred *after* the initial determination of eligibility." *Id*. "Indeed, evidence could exist . . . at the time that the plan fiduciary initially granted benefits that demonstrates that the ERISA plaintiff is not totally disabled." *Id*.

Thus, Hartford was not necessarily required to point to proof that Young's condition changed after the initial disability determination. The issue is whether there is substantial evidence to support the administrator's decision that Young failed to prove that she is "prevented from performing one or more of the Essential Duties of Any Occupation" for which she is "qualified by education, training or experience." (AR at 19, 20.)

Young's second argument is really the crux of her motion. Young argues that Hartford's decision is arbitrary and capricious because it ignored evidence that she experiences "pain [and]

and inability to move her head and neck." (DE 25-1, Mem. at 19.) In support of this argument, Young points to a 2011 MRI; the treatment notes, Attending Physician's Statements, and Physical Capacity Questionnaires of Dr. Truman Perry (Young's treating physician) and Joseph Shelton (a physician's assistant in Dr. Perry's office); and the IME that she commissioned by Dr. James Owen.

Dr. Perry's most recent Attending Physician's Statement is dated December 1, 2017. (AR at 787.) In it, he opines that Young could sit for only one hour at a time for only one hour in an eight-hour day. He put the same restrictions on Young's ability to stand and walk. Dr. Perry further opined that Young could never bend at the waist, kneel/crouch, climb or balance and that she could drive for only up to 2.5 hours. He determined that she could occasionally lift 10 pounds. Dr. Perry concluded that these restrictions would apply permanently.

As to the IME by Dr. Owen, he described Young as a 50-year old female on disability due to the severity of her neck problem with pain radiating to the back and into her shoulders. (AR at 630.) Young told Dr. Owen that the problem started because she had to look up constantly to stack trays at her workplace. Dr. Owen states that neurosurgeon Dr. Brett Scott had determined that surgery was too dangerous and, thus, Young had been treated with "just pain medication." Dr. Owen stated that Young saw Dr. Perry every two months "for narcotic maintenance," which consisted of hydrocodone and low-dose aspirin. (AR at 630.)

Dr. Owen opined that Young was "obviously in pain" and that the 2011 MRI is "tremendously terrible." (AR at 632.) He concluded that she was "indeed disabled" and that she would not be able to lift or carry objects weighing more than five pounds or do any type of activity that required rapid neck turning. Dr. Owen stated that he "saw no evidence of symptom magnification or disingenuous behavior in my office today." (AR at 633.)

While Dr. Perry had opined that Young was significantly restricted in her ability to work, Hartford determined that his treatment notes and those of Mr. Shelton documented "normal exam findings and stable conditions." (AR at 229.) Further, while Dr. Owen had determined that Young was disabled, Hartford had requested an IME from Dr. William J. Lester, who noted that Young's inability to turn her neck when asked to was inconsistent with her ability to move her neck 30 degrees at other times during the examination. He also noted that there was "no objective reason" that Young had "no flexion of neck or extension." (AR at 755.) Dr. Lester concluded that Young could sit for five hours a day, one hour at a time; stand for 2 hours a day, 30 minutes at a time; and walk for one hour a day, 20 minutes at a time. (AR at 755.) He further determined that she could lift 12 pounds maximum and 10 pounds occasionally.

Because of these discrepancies, Hartford requested that Dr. Weisberg conduct an independent review of Young's medical records. Dr. Weisberg had a conversation with Mr. Shelton in Dr. Perry's office, who told Dr. Weisberg that Young had severe neck pain and had visited Dr. Perry's office every two months or so for "a number of years" for pain medications.

Dr. Weisberg noted that Young had seen neurosurgeon Dr. Scott in 2011 after the MRI. While Dr. Owen's report stated that Dr. Scott had informed Young that surgery was too dangerous, Dr. Weisberg reviewed Dr. Scott's notes, which actually state that he was "not sure" if surgery was a good option. (AR at 1006.) Dr. Scott had ordered a CT scan in 2011 of the cervical spine to further assess the possibility of surgery and possible physical therapy. (AR at 1005-06.) As Dr. Weisberg noted, there is no evidence in the record that Young ever returned to Dr. Scott for the CT scan or for further information about surgery or physical therapy or for any follow-up visit at all.

Dr. Weisberg noted that, while Mr. Shelton said that Young "did not appear" to be a surgical candidate, there was nothing in the record indicating a "final opinion about surgery." (AR at 568.) Dr. Weisberg noted that, other than that of Dr. Scott, Young's medical record did not contain "any physical therapy or pain management evaluations."

Dr. Weisberg noted that Dr. Perry had opined that Young could sit, stand, and walk for one hour at a time for only one hour a day. Dr. Weisberg also noted, however, that in a February 2018 exam, Dr. Perry concluded that Young had "fair control of her neck and back pain." (AR at 568.) Dr. Weisberg further noted that in exams in March and April 2018, Dr. Perry determined that Young's neck and back pain "were all stable on her current medications" and her exams were normal. (AR at 568.) In May 2018, Dr. Perry again noted that Young's "chronic back pain was stable" and her exam was normal.

In her reply brief, Young argues that Dr. Perry's notes do not indicate normal exams. As Young recognizes, Dr. Perry's notes are difficult to read. Accepting Young's interpretation of Dr. Perry's notes (DE 25-1, Mem. at 18, n.7), they certainly document that Young experiences neck and back pain and decreased range of motion. Dr. Weisberg does not dispute that and, thus, he imposed restrictions on Young's ability to reach, lift, carry, push, and pull. Further, the evidence also supports Dr. Weisberg's finding that any pain that Young experienced in her neck and back was stable and being managed with only pain medication. There is no evidence in the record that Young ever sought any other kind of treatment.

Young argues that Dr. Weisberg's opinion is flawed because Hartford did not provide him with her sworn statement. However, Dr. Weisberg includes an October 3, 2018 statement by Young in the list of documents he reviewed. (AR at 567). In her reply brief, Young points out that her telephonic statement was made September 27, 2018. Nevertheless, as she also

recognizes, the certification of the court reporter for that statement contains the October 3, 2018 date. (AR at 629.) Further, Young points to no other statement by her or any other document dated October 3, 2018 that Dr. Weisberg could be referencing.

Young argues that Hartford never gave any reason for rejecting medical opinions in the record conflicting with Dr. Weisberg's. "Plan administrators . . . may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003). Nevertheless, plan administrators do not have "a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Id*.

As discussed, Dr. Weisberg explained why he did not find that the opinions of Dr. Perry, Mr. Stewart or Dr. Owen were supported by the medical evidence in the record. In its denial letter, Hartford explicitly pointed out that Dr. Weisberg had noted that Young's neck and back pain was "doing well with medications" (AR at 190, 192) and she had "normal exam findings." (AR at 192.) Hartford stated that the medical records showed that Young's "conditions/symptoms have remained stable and/or in fair control with medications." (AR at 190.) Hartford further noted that Mr. Shelton had informed Dr. Weisberg that Young had not seen another neurosurgeon or spinal surgeon since Dr. Scott in 2011 and, while she had been treated with pain medication for a number of years, she had never been treated with physical therapy, surgery, or any other pain management treatment. (AR at 192.) In addition, Hartford pointed out that, other than the 2011 MRI, no additional studies had been performed on Young with regard to her back pain. (AR at 192.)

As to the IME of Dr. Lester, Dr. Weisberg notes that Dr. Lester felt that Young was inconsistent during his exam regarding the ability to move her neck. (AR at 568.) Again, Dr.

11

Lester noted the "inconsistencies" of Young not being able to turn her neck when she was asked to, but her ability to move her neck 30 degrees when she was looking. Dr. Lester also found "no objective reason" that she would have "no flexion of neck or extension." Dr. Lester also noted that Young had never been treated with physical therapy or surgery for her neck and back pain.

Furthermore, it was Dr. Lester's opinion that formed the basis for Hartford's initial decision that Young had failed to prove that she is disabled. Young argues that Dr. Lester's opinion should have led to a conclusion that she is not capable of performing any occupation. This is incorrect. While the restrictions Dr. Lester imposed on Young's physical abilities were more severe than those imposed by Dr. Weisberg, the subsequent employment analysis identified various occupations that Young could perform even under Dr. Lester's restrictions. That analysis specifically noted that all the identified occupations could be performed while alternating between sitting, standing, and walking "which can be timed at the worker's own volition or as needed in the course of production." (AR at 716.)

Given the discrepancies in Young's medical record on appeal bearing on her physical abilities, Hartford reasonably sough a medical review by Dr. Weisberg, who sifted through each of the opinions to arrive at a determination as to any restrictions that should be imposed on Young's ability to work. The findings of Dr. Weisberg provide a reasoned explanation for Hartford's conclusion that Young failed to prove she was disabled. *Judge*, 710 F.3d at 657.

Finally, Young argues the Court should find the Hartford decision is arbitrary is because the employment analysis was based only on the findings of Dr. Weisberg. As explained above, however, Dr. Weisberg considered the opinions and medical records of the other physicians when determining Young's restrictions. Hartford reasonably gave the vocational expert a copy of Dr. Weisberg's report. The vocational expert is just that – an expert in the labor market and the

skills needed to perform particular jobs. The vocational expert is not qualified to sort through various medical opinions to develop his own determination of a plaintiff's disabilities.

Young also argues that the employment analysis incorrectly identifies jobs available to her that she does not have the skills to perform. In the report, the vocational expert states that he has identified one occupation within the "closest" level, three occupations with the "good" level, 236 occupations within the "fair" level, and 2,354 occupations within the "potential" level. In her motion, Young argues that jobs identified at the "fair level" imply that additional training is necessary. (DE 25-1, Mem. at 22.) But even if so, those were not the only jobs that the vocational expert identified. Further, the expert stated that the jobs identified "use work habits and traits that the claimant possessed and has acquired through her work experiences." These skills include "identifying problems or defects, using and monitoring machinery, performing a variety of duties, and coordinating actions with other individuals." (AR at 512).

The vocational expert specifically states that he eliminated any jobs that would require additional training or education. (AR at 511.) He further explains that the identified occupations were "entry level and require no protracted training and/or time to learn the techniques, acquire the information, and develop the faculty needed for average performance." (AR at 512.) The expert stated that the jobs required "no prior experience" and could be performed "with short term on the job training." (AR at 512.) Further, the expert explicitly determined that the identified occupations "use worker traits and habits that Ms. Young possesses and that were acquired in her work experiences." (AR at 512.)

In her motion, Young argues that that the employment analysis that Hartford cited in support of its decision on appeal was flawed because it was completed by the same vocational expert who completed the employment analysis that Hartford had relied on for its initial decision

denying benefits. In her reply brief, however, Young concedes that it was not inappropriate to rely on the same vocational expert for the initial and final decisions. (DE 27, Reply at 9. n. 5.)

**III. Conclusion**

For all these reasons, the Court hereby ORDERS that Plaintiff Gina Young's motion for judgment in her favor (DE 25) is DENIED. The Court will enter a judgment in favor of defendant Hartford Life & Accident Insurance Company.

Dated March 2, 2020

KAREN K. CALDWELL
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF KENTUCKY